Case number five for argument this morning is United States v. Jackson. Mr. Otis. May it please the court, my name is Nathan Otis and I represent the defendant appellant Hurley Jackson. Your honors, Mr. Jackson has raised two claims in his appellate brief. It is my intention to focus solely on the prosecutorial misconduct claim and rely on the arguments in our brief as to the evidentiary issue. Turning then to prosecutorial misconduct, Mr. Jackson's due process right to a fair trial was violated when the prosecutor improperly argued in closing by both vouching for key government witnesses and by asking the jury to consider issues outside of the defendant's innocence or guilt, specifically the broader societal benefits of incentivizing witness testimony. There were not timely objections to either of these matters at trial, leaving this court to review them for plain error. In regard to vouching, this court defines vouching as either expressing a personal opinion as to the credibility of a witness or suggesting facts outside of those presented to the jury lend credibility to that witness. And here, regarding three key government witnesses, Marguerite Tompkins, Charles Hall, and Tiffany Bell, the prosecutor's argument really created both of those forbidden inferences. The specific argument was first the pronouncement that the trial court, Judge Conley, knew the facts of this case by virtue of presiding over sentencing hearings. That was followed immediately with the rhetorical question, do you really think these three witnesses would come before the person they're looking to catch a break from and lie? The combination of those two statements amounted to impermissible vouching. It left the impression that these witnesses would be unable or unwilling to lie in front of the trial court because he had some superior ability to discern truthful or untruthful testimony. ESP? Essentially, that he was a human lie detector. And the problem with that I must say, counsel, I understood the argument differently. It was the defendant, I mean, sorry, the witness is less likely to take a particular risk of committing perjury when that risk has its consequences, not only the standard punishment for perjury, but also losing the benefit of a bargain. I didn't see any suggestion that the government would be in some way relieved of its duty of showing that he had lied, or that the judge had already decided whether a lie had been told. Well, your honor, I guess I don't see it that way. And I think that is perhaps one inference which could be present or isn't present in similar types of cases. But here, I see the real problem is tethering these two statements together. It wasn't simply saying, hey, this witness would be in some trouble if they got up there and perhaps the government doesn't think they testified truthfully. What this was, was suggesting that the trial court itself had an ability to discern whether or not that testimony was truthful. And the problem, and that was by virtue of explicitly saying, this judge knows the facts of this case. And the problem there is there was simply no evidence in the record to suggest that's true. And it creates an inference outside of facts presented to the jury that lends credibility to these witnesses. That's a possible, that's one way to interpret this. But that leads me to my biggest concern, which is that your argument seems to be structured based on possible inferences the jurors could draw. Maybe they were intended to draw them. But if there's an objection, the judge can step on those inferences pretty quickly and thoroughly. The judge didn't have the opportunity to do that without an objection here. I agree. There was not an objection lodged, which certainly did deprive the judge the ability to rectify that situation at that point. I mean, he could have stepped in. But your argument is, in essence, it's a mistrial because he didn't do it on his own. But it's, there aren't, it takes an awful lot to get a judge to step in. Well, I mean, I do agree. But I think here, this did warrant the intervention of the court. And I think the problem, again, is really the tethering of those two statements. Individually, or specifically the rhetorical question standing alone, I don't think would have been as problematic. But I think tying that to really an enhancement of the trial court's both knowledge and suggesting that the trial court had a role in discerning whether or not that with the impression that these witnesses would have been testifying truthfully when that wasn't simply the case. I think it also created the forbidden inference that was discussed in the Sixth Circuit case, United States v. Carroll, suggesting that absent some intervention there, the trial court did, in fact, sanction or approve of the truthfulness of that testimony. So I think, really, both sides of that vouching were present here, which did create sufficient prejudice and should have warranted intervention by the trial court. I think the prosecutor also improperly argued by then asking the jury to consider the broader societal considerations, which he put in play here. And specifically, that argument was that incentivizing witness testimony, essentially offering cooperating witnesses deals, was unambiguously good for the criminal justice system. And it was so because it was the only way in which law enforcement could prosecute upper echelon drug dealers and the only way to stop heroin from flowing into central Wisconsin. This court's long held it's improper to ask a jury to return a verdict on considerations other than a defendant's innocence or guilt. It's improper to ask a jury to send a message or to restore civil order or to suggest that their verdict will somehow hinder future law enforcement prosecutions. And I think that was along the confining the argument to just what evidence was presented to this jury, which would have bolstered the credibility of any individual cooperating witness. This shifted the focus to outside considerations and essentially was a utilitarian argument, asking the jury to ignore or accept the credibility questions they might have had about specific witnesses because there was a didn't just say there's a broader societal benefit, but if you fail to do so, law enforcement's not going to be able to stop heroin from coming into your very own communities from where these jurors came, which I think not only made this plainly improper, but also really heightened the prejudice that was at play here. And to that last point regarding prejudice, because obviously the court doesn't need to simply find plain error, but has to find the prejudice flowing from that affected outcome of this trial, there are three points that I want to just briefly mention. As to the nature and seriousness of these statements, I think regarding the vouching, I think this takes from what might be sort of a benign error would be placing the government's own personal opinion behind these witnesses, tethering it in fact to the trial court, I think heightens that prejudice. Regarding the arguments about the broader societal considerations and asking the jury to consider those, one, as I mentioned, it tied it to their very own communities, which I think heightened the prejudice. But most importantly, that argument touched and really affected the jury's credibility determinations for all eight of the cooperating witnesses. And when you balance that against the additional evidence or the overall body of evidence, there's no question that Mr. Jackson was a drug dealer. He admitted that, but that simply wasn't the question that the jury was substantiate all three of the counts against him. The government needed the testimony of these cooperating witnesses and needed it to be credited by the jury. And because these arguments infected those credibility determinations for all of these witnesses, it really made the prejudice pervasive, which I think warrants a reversal in this matter. So absent any other questions from the court, I will reserve the remainder of my time here for rebuttal. Certainly, Mr. Otis. Thank you. Mr. Roche. Good morning, Kim O'Shea for the United States. I will clear up one quick thing before getting to the argument itself. The jury was not drawn from Portage County. The federal district court, when trials are held in Madison, do not pull from Portage County. But let's get right to it. In retrospect, my four words, he knows the facts, were regrettable. But in the context of the entire case, those four words did not undermine the evidence, the overwhelming evidence of the defendant's case. The government's argument that the three witnesses, Bell, Hall, and Tompkins, had a disincentive to lie before Judge Connolly was a common-sense response to the defense opening statement that the government's witnesses were unbelievable because they were paid for. Overall, the government's argument that the government's witnesses desired a sentencing reduction was just the other side of the coin of exactly what the defense was saying. And the government said, yeah, I agree. They do want a sentencing reduction. And I pointed out that their self-interest aligned with credibility. Similarly, there was no error in talking about the practical way cooperation works. And I tied that particularly to count three. The argument did not invite the jurors to consider the societal consequences of the verdict at all. But again, it was responding to the defense argument that the government used cooperation and paid these witnesses. Count three was a perfect example. This gentleman, Casey Edelbeck, was pulled over for operating while impaired. He decided to cooperate. He cooperated against Ms. Bell. I'm sorry. He cooperated against Mr. Jackson by texting Jackson to set up a controlled purchase of heroin. It turned out that Ms. Bell delivered it. Based on Edelbeck's cooperation, the law enforcement was able to build a case against Ms. Bell. There was a search warrant for Ms. Bell's home. Eventually, then she cooperated. They found phone finding evidence of the defendant, Curley Jackson's, guilt. And again, nothing about the government's argument tied this practical, pragmatic discussion of evidence to the verdict. The most important thing is the defendant can't show, as he must in the plain air standard, that the government's four words or several words affected his substantial rights. And that's so for two different reasons. First of all, Judge Connolly explicitly told the jury to decide the facts based on the evidence and that the attorney's arguments were not evidence. The big thing is, and both Morgan and Alexander talk about this, that the most important thing is the weight of that. And that breaks into four different categories. First of all, multiple witnesses testified that the top tier conspirators, that is, including Mr. Jackson, distributed heroin cooperatively, that they pooled funds, that they directed heroin customers to each other to physically get heroin or to pay for heroin that had been previously supplied by another supplier. Bell, Hovick, and Tompkins testified that Jackson's supervisor coordinated the entire process. Multiple witnesses testified that the top tier distributors used others to test heroin and to transport heroin to central Wisconsin. And all these witnesses were cooperated not just by each other, but also by the physical and the electronic evidence in this case, most importantly, Mr. Jackson's own words. That if Mr. Jackson was in a series of calls with his brother who was incarcerated during the time of the conspiracy, they talked about heroin inventory. They talked about Mr. Dwight Williams' role in the scheme. They named the sub-distributors by name, many of whom, many of these people also testified at trial. During the conversations, they set up a drug deal where Mr. Jackson agreed to deliver heroin at Mr. Hall's request, Mr. Hall being corroborated by Mr. Jackson's attempt to send her a letter to convince her not to testify. Bell, Prejeanette, and Cody Thompson were all corroborated again by Mr. Jackson's own words in his text messages between the defendant and Ms. Bell and also Thompson, where the defendant directed Ms. Bell to deliver heroin to Mr. Thompson. Count two, again, overwhelming evidence there and also corroboration by physical and electronic evidence. Hall and Thompson were corroborated by the Portage County arrest records in the defendant's multiple calls to Mr. Hall. Count three, Bell and Adelbeck were corroborated by the defendant's text messages setting up the transaction. They were corroborated by the actual heroin that was delivered, photos of the transaction, and then a phone analysis. And that phone analysis showed that on the one hand, the defendant communicated with Mr. Adelbeck by phone and text message to set up the deal and that the defendant communicated with Ms. Bell for the delivery. In sum, again, it was regrettable. It was my four words. It was my mistake. But there was overwhelming evidence of the defendant's guilt and those four words don't undermine the whole case. Three days of overwhelming testimony against Mr. Jackson. That's it for the United States. Any questions before I sit down? Thank you. Thank you, Mr. O'Shea. Anything further, Mr. Otis? Very briefly, Your Honor. Well, a minute and 42 is what it's about. I want to address the prosecutor's arguments regarding the overall prejudice here as that's weighed against the weight of the evidence. First, whether or not the jury was instructed is one of the five factors the courts to consider. And I think while there was certainly the standard jury instruction about that they should decide the case on the evidence, not the attorney's arguments, I don't think that is sufficient to cure the level of improper argument here. If that were, then we'd never be here addressing this type of claim because it would cure it every time. Regarding the corroboration that Mr. O'Shea went through, the physical and electronic evidence that existed here simply was not sufficient to establish convictions on any of the three counts. There was evidence to be sure that Mr. Jackson distributed drugs during the period of the conspiracy, but his defense was that he had a buyer-seller relationship with some of these people. The corroboration always relied on the credibility determinations that the jury had to make on those is really what makes the difference between whether or not there was a conviction here or not. And because the credibility determinations were infected by these improper arguments, that is where we have the problem that warrants reversal. So that's what I had to say. If there are any questions from the court, I'm happy to address them. Otherwise, I ask that you reverse the convictions. Thank you. Thank you very much. And Mr. Otis, we appreciate your willingness to accept the appointment in this case. The case is taken under advisement.